UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| PROPHETE ALEXIS | * | CIVIL ACTION NO.  11-0309<br>Section P |
| VERSUS | * | JUDGE DONALD E. WALTER |
| JOHN SMITH (WARDEN), ET AL. | * | MAG. JUDGE KAREN L. HAYES |

REPORT AND RECOMMENDATION

*Pro se* petitioner Prophete Alexis filed the instant petition for writ of *habeas corpus*

pursuant to 28 U.S.C. §2241 on February 23, 2011.  Doc. # 1.  Petitioner is an immigration

detainee in the custody of the Department of Homeland Security, Immigration and Customs

Enforcement (DHS/ICE) who is awaiting removal to his native country, Haiti.  He is currently

detained at the Tensas Parish Detention Center, Waterproof, Louisiana.  Despite his alleged

cooperation, DHS/ICE has been unable to remove him.  As a result, he has remained in custody

pending such removal for a period approaching or in excess of six months.  This matter has been

referred to the undersigned for review, report, and recommendation in accordance with the

provisions of 28 U.S.C. §636 and the standing orders of the Court.  For the following reasons it

is recommended that the petition be **GRANTED,** and that he be released from custody pending

removal upon reasonable restrictions.

BACKGROUND

Petitioner entered the United States on November 9, 2000, as a lawful permanent

resident.  Doc. # 22.  Petitioner was ordered removed by a final order dated April 27, 2010, and

has been in ICE custody since August 25, 2010.  Doc. # 17.  In initial briefs, both parties agreed

that Petitioner had been in post-removal order detention for more than six months, and that the

Petitioner had not in any way failed to cooperate in his deportation.  Doc. # 1; Doc. # 9-1.  On

April 29, 2011, the undersigned issued an Order setting an evidentiary hearing to determine the

following issues:

> 1)      Whether there is a significant likelihood of removing Petitioner in
>         the reasonably foreseeable future,
>
> 2)      Whether the Petitioner has been detained beyond what is
>         reasonably necessary to secure his removal, and
>
> 3)      Whether the Petitioner has taken steps to hamper the removal
>         efforts of the United States Immigration & Customs Enforcement.

In the Order, the undersigned appointed Rebecca Hudsmith, Federal Public Defender for

the Western District of Louisiana, to represent Petitioner at his hearing pursuant to Rule 8(c) of

the Federal *Habeas Corpus* Rules and 18 U.S.C. § 3006A.  Doc. # 11.

At the evidentiary hearing, the Government called as its witness Robert Helwig, who has

served since February 2009 as the Assistant Director for Removal in the Office of Enforcement

and Removal Operations at ICE headquarters in Washington, D.C.  Tr. [Doc. # 20, p. 8].  Mr.

Helwig's duties include the oversight of the Travel Document Unit ("TDO"), which is

responsible for the "acquisition of permission to return some of these individuals to Haiti";

oversight of flight operations of the agency; and the oversight of the Case Management Unit,

which is responsible for the post-order custody review process.  *Id.*

Mr. Helwig testified that the TDO handles difficult-to-obtain travel documents and also

handles special circumstances, including acquiring the permission to travel for Haiti.  *Id.* at p. 9.

The repatriation flights for Haitian nationals are coordinated out of Louisiana and depart from Alexandria, Louisiana. *Id.* at p. 10.

Prior to the January 12, 2010 earthquake that struck Haiti, ICE removed approximately 50 Haitian aliens per flight, with two flights per month, pursuant to "basically a verbal understanding with the government of Haiti." *Id.* at p. 10.  This understanding, according to Mr. Helwig, was put into place after ICE "resumed repatriations following the hurricane that struck...around 2008." *Id.* at p. 12.  When the earthquake hit Haiti on January 12, 2010, all removals were voluntarily suspended by ICE. *Id.* at pp. 12, 31.  The first repatriation flight after the earthquake was made in January 2011, with 27 aliens repatriated. *Id.* at pp. 12, 47, 81.  Mr. Helwig acknowledged that the current "informal arrangement" between the U.S. government and Haitian government could change as conditions and/or politics in Haiti change. *Id*. at pp. 67-68.

With respect to the current arrangement between the U.S. and Haiti, Mr. Helwig testified that the intent of the U.S. is to "spread [removals] out...of not more than 50 every two weeks, and right now we're not doing more than 50 per month at our own discretion." *Id.* at p. 70.  *See also* Pet'r.'s Exs. Nos. 2 (U.S. travel alert for Haiti) and 3 (U.S. press release regarding Haiti's continued temporary protected status due to the conditions there).  Mr. Helwig acknowledged that, after the January flight, there were no flights to Haiti in February or March of this year while the Government addressed various concerns of NGO's and the U.S. State Department. *Id.* at p. 17.  Flights resumed in April, which was manifest number two and resulted in the removal of 19 aliens.  This was followed by a May flight, manifest number three, which resulted in 28 aliens being removed. *Id.* at pp. 18-19, 81-82.  At the time of the evidentiary hearing, the proposed June flight (manifest number four) had been finalized and included 29 aliens; however, the

Government was unable to produce the manifest. *Id.* at pp. 91, 95. The July manifest was still in the process of review by DHS; however, it is undisputed by either Petitioner or the Government that Petitioner was not on either the June or July flights.

Mr. Helwig also confirmed that the circumstance that an alien had no family in Haiti, or a place to live, while not impacting ICE's decision, would impact Haiti's willingness to accept the person. *Id.* at p. 64. The types of issues ICE gets supplemental questions on from Haiti typically concern identification issues and "associated addresses in Haiti" because they "want to know basically that there are places that this person can go or has been where they can help validate and verify their identification and also possibly have them return to when they come back to Haiti." *Id.* at p. 64. Haiti also considers the person's identity, the person's ties to Haiti, the specific criminal convictions, and information provided on the fiche or the travel document application provided by the alien. *Id.* at p. 65.

With respect to Petitioner, Mr. Helwig testified:

> [T]here is an issue with the quality or legibility of the identity document that we have provided to the government of Haiti and we are working to resolve that issue now. It is unlikely, for that reason, that he will be on the fourth flight which would probably mean that he would be rescheduled for the sixth flight, which is in August.

Doc. # 20, p. 24.

Mr. Helwig acknowledged that he could not tell the Court with certainty when this issue will be resolved, did not suggest how the Government could secure an identity document that satisfies the quality and legibility requirements of the Haitian government, and conceded that it is possible, at some point in time, the Haitian government could refuse Petitioner's repatriation. *Id.*, pp. 84-85, 99.

Petitioner testified that he came to the United States at age 18 to join his mother and sister in Orlando, Florida, where he has lived since entering the U.S. *Id.* at pp. 106-07. Petitioner has one sister who lives in Haiti; her house was damaged in the earthquake and cannot be lived in. *Id.* at p. 108. Petitioner has not returned to Haiti in 11 years, has not been in touch with his sister, and does not know where she now lives. *Id.* at pp. 108-09; 115. Petitioner was convicted in 2007 of receiving money from a pawn shop by using a false ID and possession of cocaine; he received concurrent sentences of 57 days in jail and 18 months probation. *Id.* at pp. 109-110. In 2009, Petitioner was convicted of burglary and possession of a firearm, and received a sentence of time served and three years probation. *Id.* at p. 110.

## LAW AND ANALYSIS

In reviewing a petition for writ of *habeas corpus* by a detained alien who is subject to a final order of removal, a federal district court, pursuant to the authority of 28 U.S.C. § 2241(c)(3), is to gauge whether a particular set of circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal. In *Zadvydas*, the Supreme Court held that 8 U.S.C. § 1231(a)(6), the post-removal-order detention statute, implicitly limits an immigrant's detention to a period reasonably necessary to bring about that immigrant's removal. *Id.* at 688-98. The Court noted, however, that the statute does not permit indefinite detention; the "reasonably necessary" detention period should be limited to six months after the removal order becomes final. *Id.* at 697-702. After that six month period expires, and the immigrant demonstrates that there is no significant likelihood of removal in the reasonably foreseeable future, the government must furnish sufficient rebuttal evidence. *Id.*

As the government correctly notes, the mere expiration of the six-month detention period

does not, by itself, warrant release.  Under *Zadvydas*,

> [t]he habeas court must ask whether the detention in question exceeds a period
> reasonably necessary to secure removal.  It should measure reasonableness
> primarily in terms of the statute's basic purpose, namely, assuring the alien's
> presence at the moment of removal.  Thus, if removal is not reasonably
> foreseeable, the court should hold continued detention unreasonable and no longer
> authorized by statute.  In that case, of course, the alien's release may and should be
> conditioned on any of the various forms of supervised release that are appropriate
> in the circumstances, and the alien may no doubt be returned to custody upon a
> violation of those conditions.  And if removal is reasonably foreseeable, the
> habeas court should consider the risk of the alien's committing further crimes as a
> factor potentially justifying confinement within that reasonable removal period.

*Zadvydas*, 533 U.S. at 699-700 (citations omitted).

In adopting a sliding temporal scale for determining when continued detention is reasonable, the Supreme Court has stated that "as the period of prior post-removal [order] confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink."  *Id.* at 701.

Petitioner has been in ICE detention for almost twelve months, and has been subject to a final order of removal since April of 2010.  The United States Government has, as of January 2011 - one year after the devastating earthquake - an informal, verbal agreement with Haiti by which the Government intends to repatriate 50 Haitians per month through the end of 2011.  That informal agreement is subject to change, however, as a result of the change in the conditions and politics of Haiti, and has resulted in the repatriation of 75 Haitians as of the date of the evidentiary hearing.  The process of preparing the manifests for the repatriation flights to Haiti under the informal agreement, and in light of governing polices and priorities as reflected in Government Hearing Exhibits 1 and 2, involves decision-making at high levels of our Government, unlike in times past, and significant information demands from those high levels.

Also, Haiti itself requires information concerning addresses associated with the alien because the alien's lack of family or ties in Haiti or a place to live can impact Haiti's willingness to accept the alien.

The Government has acknowledged that the Haitian government has an issue with the legibility and quality of Petitioner's identity documents, and that it cannot be determined with any certainty when or if this issue will be resolved, leading to the possibility that Haiti could refuse to repatriate Petitioner at all.  Given these circumstances, the continuing precarious conditions in Haiti, and the concerns expressed regarding those conditions, the undersigned finds that there is no significant likelihood of Petitioner's removal in the reasonably foreseeable future. The Government argues that this Court should "provide ICE officials a reasonable amount of time within which to acquire the necessary document, present the same to their counterparts in Haiti, and schedule [Petitioner] for removal."  Doc. # 25, p. 11.  However, the Government does not describe what document is "necessary" to expedite Petitioner's removal process, only that Haitian officials desire a "better quality identity document."  *Id.*  The Government's contention that ICE is "endeavoring to rectify that issue" does not lend support to the argument that Petitioner will be removed within the reasonably foreseeable future.

It is true that, as noted by the Government, "the purpose of post-removal detention is to have an alien available when it comes time to actually remove him to another country." *Zadvydas*, *supra* at 690.  And while it may also be true that "removals to Haiti are progressing at regular intervals with no foreseeable obstacles," the Government notes in the same breath that the documentation sufficient to satisfy Haitian officials could very well be lacking the next time Petitioner is scheduled to make the flight to Haiti.  Doc. # 25, p. 11.

The record as presented by Petitioner, and not rebutted by respondents, establishes that Petitioner remains in ICE custody with no evidence that his removal is truly imminent.  The circumstance that the Government has managed to repatriate a small number of Haitians in the first seven months of this year pursuant to the informal, verbal agreement with Haiti does not support a different conclusion, or otherwise rebut Petitioner's showing under his particular circumstances.  Under *Zadvydas*, the undersigned is convinced that Petitioner's continued detention with no end in sight is not justified.

Accordingly,

## CONCLUSION

**IT IS RECOMMENDED** that Alexis' Petition for Writ of *Habeas Corpus* under 28 U.S.C. § 2241 be **GRANTED and that he be released from custody pending removal upon reasonable restrictions.**

Under the provisions of 28 U.S.C. §636(b)(1)(c) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 3rd day of August, 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE